UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFERY WOODARD,

    Petitioner,

              CASE NO. 2:06-CV-12219
 v.            JUDGE NANCY G. EDMUNDS
              MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH T. McKEE,

    Respondent.[1]
_____/

# REPORT AND RECOMMENDATION

I.  RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.  REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  A. *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  B. *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  C. *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  D. *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  E. *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    1. *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    2. *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  F. *Courtroom Seating Arrangement (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    1. *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    2. *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  G. *Prosecutorial Misconduct (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    1. *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    2. *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      a. Use of Inference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      b. Misstatement Regarding Motive and Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      c. Mischaracterization of Medical Examiner's Testimony . . . . . . . . . . . . . . . . . . . . . 23
      d. Comment on Petitioner's Failure to Testify . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
  H. *Ineffective Assistance of Counsel (Claims II, IV, VI and VII)* . . . . . . . . . . . . . . . . . . . . . . . 27
    1. *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    2. *Trial Counsel (Claims II, IV, and VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      a. Failure to Seek Suppression of Statement (Claim II) . . . . . . . . . . . . . . . . . . . . . . 28
      b. Questioning of Prosecution Expert (Claim II) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      c. Failure to Object to Seating Arrangement and Prosecutorial Misconduct (Claims IV and
        VI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    3. *Appellate Counsel (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
  I. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
III. NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

_____

  [1]By Order entered this date, Kenneth T. McKee has been substituted in place of Linda M.
Metrish as the proper respondent in this action.

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.     <u>REPORT</u>:

A.      *Procedural History*

1.      Petitioner Jeffery Woodard is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.

2.      On June 17, 1999, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316; assault with intent to do great bodily harm, MICH. COMP. LAWS § 750.84; assault with intent to commit murder, MICH. COMP. LAWS § 750.83; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court.  On July 16, 1999, he was sentenced to a mandatory term of life imprisonment without possibility of parole on the murder conviction, a term of 8-40 years' imprisonment on the assault with intent to commit murder conviction, a term of 5-10 year's imprisonment on the assault with intent to do great bodily harm conviction, and a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE VERDICT OF MURDER IN THE FIRST DEGREE AND DEFENDANT HAD BEEN DENIED DUE PROCESS OF LAW.  US CONST, AM V; MICH CONST 1963 ART I § 17.

II.     THE EVIDENCE WAS OVERWHELMING THAT DEFENDANT WAS SUFFERING A BLACK-OUT AND COCAINE-INDUCED PSYCHOSIS AND WAS INCAPABLE OF FORMING THE SPECIFIC INTENT TO MURDER THE VICTIMS, AND HIS CONVICTIONS MUST BE VACATED.

III.    DEFENDANT WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS ATTORNEY FAILED TO MOVE TO SUPPRESS HIS "CONFESSION" AND ASKED A QUESTION WHICH INEVITABLY RESULTED IN TESTIMONY SUPPORTING THE OFFENSE OF PREMEDITATED MURDER. US CONST, AM VI; MICH CONST 1963, ART I, § 17.

IV.    THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION TO SEQUESTER THE PROSECUTOR'S WITNESS, ALLOWING HER TO TAILOR HER TESTIMONY TO THAT OF DEFENDANT'S EXPERT WITNESS.

In a separate *pro per* supplemental brief, petitioner raised one additional claim:

DEFENDANT WAS COMPELLED TO SIT IN A HIGHLY CONSPICUOUS AND INHERENTLY PREJUDICIAL COURTROOM SEATING ARRANGEMENT AT HIS TRIAL BY JURY AND WAS DENIED HIS RIGHT TO DUE PROCESS AND EQUAL PROTECTION OF THE LAW. US CONST, V, XIV; MICH CONST 1963, ART I, §§ 17, 20.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Woodard*, No. 221856, 2001 WL 1134886 (Mich. Ct. App. Sept. 21, 2001) (per curiam).

4.    Petitioner, through counsel, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Woodard*, 466 Mich. 866, 645 N.W.2d 663 (2002).

5.    On December 5, 2002, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.    DEFENDANT WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL WHERE THE PROSECUTOR IMPERMISSIBLY USED INFERENCE UPON INFERENCE TO ESTABLISH THE REQUISITE ELEMENTS OF PREMEDITATION AND DELIBERATION TO SECURE A CONVICT[ION] FOR FIRST DEGREE MURDER

II.    THE PROSECUTOR'S MISSTATEMENT DURING CLOSING ARGUMENTS OF STATE WITNESSES' TESTIMONY REGARDING

MOTIVE AND CENTRAL ELEMENT OF INTENT WAS ERROR SO PREJUDICIAL THAT DEFENDANT WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.

A. THE PROSECUTOR'S USE OF INSINUATION AND INNUENDO TO CHARACTERIZE HOW THE DECEASED WAS SHOT WAS BOTH MISLEADING AND HIGHLY PREJUDICIAL AND DENIED DEFENDANT HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.

B. DEFENDANT WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL WHERE THE PROSECUTOR'S ENTIRE SUMMATION WAS DESIGNED TO AROUSE THE PASSIONS AND PREJUDICES OF THE JURY.

C. DEFENDANT WAS DENIED A FAIR TRIAL WHERE STATEMENTS MADE BY THE PROSECUTOR DURING CLOSING ARGUMENT CONSTITUTED AN IMPERMISSIBLE REFERENCE TO DEFENDANT'S FAILURE TO TESTIFY.

III. THE CUMULATIVE EFFECT OF THE PROSECUTOR'S MISCONDUCT SO TAINTED THE JURY'S DELIBERATION WITH SPECULATION, CONJECTURE, AND UNFOUNDED INNUENDO THAT DEFENDANT WAS DENIED HIS RIGHT TO DUE PROCESS AND FAIR TRIAL.

IV. DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS WHERE COUNSEL FAILED TO OBJECT TO ANY OF THE FORGOING [sic] ERRORS.

V. DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO OBJECT TO A COURTROOM PROCEDURE THAT COMPELLED DEFENDANT TO SIT IN A HIGHLY CONSPICUOUS AND INHERENTLY PREJUDICIAL SEATING ARRANGEMENT WHICH EXTINGUISHED DEFENDANT'S PRESUMPTION OF INNOCENCE AND VIOLATED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.

VI. THE FAILURE OF FORMER APPELLATE COUNSEL TO RAISE THE SIGNIFICANT AND OBVIOUS ISSUES RAISED HEREIN DENIED DEFENDANT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL AND WAS CAUSE FOR DEFENDANT'S FAILURE TO RAISE THESE ISSUES ON HIS APPEAL OF RIGHT AND RESULTED IN PREJUDICE TO

DEFENDANT.

On March 2, 2004, the trial court denied petitioner's motion for relief from judgment. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Woodard*, 474 Mich. 977, 707 N.W.2d 207 (2005); *People v. Woodard*, No. 260559 (Mich. Ct. App. Aug. 16, 2005).

6.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on May 15, 2006. As grounds for the writ of habeas corpus, he raises the sufficiency of the evidence, ineffective assistance of counsel, and prejudicial courtroom seating claims that he raised on direct appeal, as well as the ineffective assistance of counsel and prosecutorial misconduct claims that he raised in his motion for relief from judgment.

7.      Respondent filed his answer on December 8, 2006. He contends that petitioner's claims first three claims are without merit, and that petitioner's remaining claims are barred by petitioner's procedural default in the state courts.

8.      Petitioner filed a reply to respondent's answer on January 8, 2007.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner was convicted in connection with the shootings of Latonya Thompson, Henry McHolmes, and Johnny McMillian on May 8, 1998. The evidence adduced at trial was accurately summarized in the prosecutor's brief in the Michigan Court of Appeals on petitioner's direct appeal:

> Latonya Thompson was living at 4237 Belvidere in May of 1998. Defendant and victim Henry McHolmes picked Thompson up at a girlfriend's house and the three went to the Belvidere house. Thompson had known defendant for eleven of twelve years. The two paid the rent as defendant lived there off and on. Thompson and defendant had a relationship, and had disputes over other men.
> When the three returned, alcohol and drugs were consumed. The third

victim, Johnny McMillian, came over and joined the party. McMillian arrived about 6:00 o'clock, left, and then returned around 9:00 or 10:00 o'clock.

Thompson's aunt, Princess, and her male friend, Blake, also stopped by the house for a short while. Defendant wanted everyone to leave, but they didn't. Those who left were Princess and Blake.

Thompson wanted to leave to shoot pool, but defendant, McMillian, and McHolmes wanted to stay and get high. Defendant and McMillian discussed the money McMillian owed defendant. Defendant asked McMillian for cocaine as payment because he didn't have any change to give McMillian for the monies owed. McMillian told defendant he needed his money and asked if defendant would trust him until he could get change. Defendant agreed.

Defendant and McMillian sat down on the couch. McHolmes was seated nest to a coffee table in the living room. Thompson was dancing to the music. Then she heard a loud noise and saw fire that was coming at her. Thompson realized defendant shot her and collapsed to the floor. She could not get up. But when she looked up, defendant was standing by the door and he shot McMillian. McHolmes was the last to be shot. Defendant then left the scene of the crime.

Thompson got hit in the small intestines, just below the waist line. After defendant left, Thompson crawled out on to the porch and cried out for help – to call the police and the EMS. She yelled out that defendant had just shot the three of them. Thompson stayed in the hospital for three days. McMillian was dead by the time the police arrived.

Thompson testified that defendant seemed to be able to walk all right and to talk all right. Defendant also appeared to be able to point the gun accurately and hit his target. Thompson stated that even though she had been smoking cocaine that day and drinking alcohol, she did not have occasion to kill anyone.

On cross, Thompson said that defendant had been smoking crack and drinking during the entire length of their relationship. She described the atmosphere on the night of the shooting as friendly, except for defendant and McMillian. At some point defendant acted like he got pissed off and that he wasn't going to trust McMillian with the monies owed defendant. McMillian apparently capitulated and gave defendant the crack cocaine as repayment for the debt owed to defendant.

Thompson denied that she and defendant had an argument. She stated that defendant wanted to talk to her. The two did not argue. Thompson reiterated that defendant appeared to walk and talk all right, and Thompson even asked defendant why he shot her before defendant left. Defendant just looked and stared at her like she was crazy. Thompson acknowledged that defendant's behavior was unusual, but that he just sat there on the couch with that gun.

Henry McHolmes had difficulty taking the stand due to the injuries sustained by defendant having shot him. He had no idea how long he had been hospitalized and had received psychiatric care as a result of being shot.

Before being shot, McHolmes was with Thompson and the two were enjoying themselves. McHolmes first saw defendant around 6:00 to 7:00 o'clock that evening. Thompson told McHolmes that when defendant came by, he was to tell

defendant that she was at Mom McGhee's house. Defendant arrived and the two drove over to pick up Thompson at her girlfriend's house. Defendant seemed able to walk, talk, and drive the car fine at that point in the evening.

When the three arrived back at the Belvidere address. McHolmes went in as he was thinking of doing some work on the windows. He was helping the two fix up the home. No one was partying at that point in time, but later on in the evening the four of them began to party; smoking crack and drinking. McHolmes said that the partying started before 11:00 p.m. McMillian was McHolmes' cousin. Defendant was drinking also. McHolmes and defendant went out for more alcohol, then defendant stopped at a relative's house to do some business. McHolmes saw defendant purchase and then drink a 20 oz. beer, and some dark liquor as well. McHolmes said that one does not stay that high after a puff of crack cocaine. McHolmes testified that defendant was smoking crack and blowing heroin, or sniffing it up his nose.

McHolmes left for awhile and when he returned defendant was not there. Defendant soon reappeared. Thompson was dancing to the music, McMillian was seated on the couch, and McHolmes was seated in a chair. The next thing McHolmes knew was that Thompson said "Pookie, Jeff done shot me." Before he knew it, McHolmes had been shot too. McHolmes stated that defendant walked right up to him, at which time McHolmes stood up. Defendant put the pistol in McHolmes' stomach and pulled the trigger. McHolmes was apparently as perplexed as everyone else about the shooting for at the end of his testimony, he said "Why [he shot me], I don't know. Why did you shoot me, man?" [directing question to the defendant seated in court].

McHolmes testified that he worked for defendant and was working on the Belvidere address. Defendant stayed there off and on, but Thompson lived there. Even though defendant was drinking, he did not appear to be drunk in McHolmes' opinion. McHolmes testified that he let defendant keep his money because defendant was supposed to help him purchase a truck.

A stipulation was entered into that McMillian's body was taken out of the house and transferred to the Wayne County Medical Examiner's Office where he was identified.

Dr. Cheryl Lowe, an assistant Wayne County Medical Examiner, testified that McMillian had no alcohol in his blood but had a small amount of cocaine in it. He was shot through the left arm and the bullet reentered the body and moved from left to right, severing the aorta. The doctor testified that a person suffering from these types of wounds would survive for only a matter of minutes.

Police Officer Eugene Goldston, a 25 year veteran, made the scene of the crime. The three victims were lying at various points in the crime scene. Latonya Thompson said that defendant shot them all for no apparent reason. She gave a physical description of defendant and of his vehicle.

Police Officer David Croskey was working at the desk at the 13th precinct at around 9:00 a.m. when defendant walked in and stated that he killed some people and he was there to turn himself in. The officer asked defendant who he shot and

defendant responded that he shot these people because he was mad at them. Defendant told the officer that after shooting the people, he went to the Belle Isle Bridge and threw the gun over the bridge. Croskey, Sergeant Ralph McNeil and Kathy Vaugh, who were working with Croskey, made efforts to determine if there was an open homicide case. They determined there was an open file, relating to what defendant told them. Croskey processed defendant and then had him transported to Homicide.

On cross, Croskey said defendant appeared lucid when he walked in. Defendant also told the officer that they had been smoking crack. Croskey reiterated that he thought defendant said he shot these people because he was mad that they were in his house. Croskey testified that Homicide handled all the questioning of defendant. All Croskey and the Sergeant did was ask defendant what the location was of the shooting, asked him how did it happen, and information about defendant.

Sergeant Ralph McNeil, a thirty year veteran, was working the desk with Croskey. McNeil was the desk supervisor. Defendant walked up to McNeil and said that he wanted to turn himself in and that he was wanted. The Sergeant asked "What do you mean you are wanted?" and "What are you talking about?" Defendant responded that he shot several people and that they were looking for him. Defendant gave a location for the shooting. McNeil asked defendant to let him know what happened. Defendant said that his girlfriend lived in this area and he was over at her house. She and several others were smoking crack. Defendant joined in with them and then he got angry because of the fact that they were smoking crack. So defendant pulled out a .45 automatic and began shooting everyone. The Sergeant asked defendant to stop talking, and Homicide was called. McNeil had defendant stop talking to verify with Homicide that a shooting had in fact taken place at the location indicated. McNeil confirmed that there was a shooting, confirmed the location, and confirmed who was wanted. Defendant had already given McNeil his I.D. so when Homicide told McNeil that defendant was wanted, McNeil told defendant he was placing him under arrest. McNeil gave defendant his *Miranda* warnings. Even after receiving *Miranda* warnings, defendant was still willing to make a statement and he repeated everything that he had told Croskey and McNeil.

On cross, McNeil stated that he was the only one asking defendant questions. Croskey took defendant's prints so he interacted with defendant in regards to his being fingerprinted. McNeil reiterated that defendant told him that he shot his girlfriend and friends because he was angry. Defendant appeared remorseful and lucid when McNeil was talking to him. McNeil did not put all the details defendant relayed in his PCR (preliminary complaint report) because he was only making a brief report.

On redirect McNeil stated that his job was not to take statements for the Homicide unit and that is why he only made a brief report. McNeil arranged to have defendant transported to Homicide.

Police Officer Gregory Jones from the Homicide Unit testified that he gave defendant his rights and took a four page statement from defendant. It was read into the record. Defendant left out the part about his being mad at everyone for smoking

crack.

The People rested after waiving the remainder of the witnesses.

At the beginning of the next day's proceeding, the matter of the prosecution's expert witness remaining in court while defendant's expert testified was discussed and the court ruled in favor of the prosecution. The prosecution argued that: 1) sequestration is discretionary with the court; 2) the purpose of sequestration is to prevent witnesses from tailoring their testimony to one another; and 3) the court rule provides that an expert may base his opinion on facts perceived by or made known to the expert at or during the hearing.

The defense case-in-chief consisted entirely of the testimony of Firosa Van Horn, clinical psychologist who had received a doctorate in clinical psychology and worked in Recorder's Court Psychiatric Clinic for a few years, among other jobs. Essentially her testimony was that defendant was incapable of forming the requisite intent for first-degree murder – premeditation and deliberation – because of the voluntarily consumed alcohol and drugs. Thus, her opinion was that, while defendant was criminally responsible, he was suffering from diminished capacity.

In rebuttal, the People called Edith Montgomery, also a Ph.D. in clinical psychology, but who was currently working in the Third Judicial Circuit's Psychiatric Clinic. Her opinion was diametrically opposed to Van Horn's in that Montgomery felt that defendant did not suffer from diminished capacity at the time he committed the offense. One of the tests administered to defendant

produced a profile and it suggested that he was somewhat defensive; he tended to present himself in a favorable light, denying things like human frailties. And there was evidence that he had difficulty expressing his emotions. He had low frustration tolerance and impulsiveness. He was found to be somewhat rebellious and there was some risk of acting out. There was also found to be a tendency to blame others for his problems.

He again, according to his responses, it is – he is someone who can make a good first impression but [his] impulse control tends to be somewhat poor.

Q. All right. Anything else, without referring to your report, that you can recall?

A. Just on an emotional level, he's someone that's going through angry feelings, having angry feelings.

At the conclusion of Montgomery's testimony, defendant's counsel asked, and received, the following answer:

Q. I neglected to ask these, doctor.

Did Mr. Woodard have the chance to premeditate the murder? In other words, think it out beforehand based on his particular state of mind at the time of the offense based on what you know?

A. From all the information I received, if he had chosen to make that intent, he could have.

The jury convicted defendant as charged of first-degree murder, assault with

> intent commit murder, and felony firearm.  The jury returned one lesser count of
> assault with intent to do great bodily harm.

Br. of Pl.-Appellee, in *People v. Woodard*, No. 221856 (Mich. Ct. App.), at 4-12 (citations and

footnotes omitted).

C.      *Procedural Default*

Respondent first contends that petitioner's fourth through seventh claims are barred by

petitioner's procedural default in the state courts, because petitioner failed to raise these claims on

direct appeal.  The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of

federal law if the state court's decision rests on a substantive or procedural state law ground that is

independent of the federal question and is adequate to support the judgment.  *See Coleman v.*

*Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration

of a federal claim on either direct or habeas review unless the last state court rendering a judgment

in the case 'clearly and expressly' states that its judgment rests on the procedural bar."  *Harris*, 489

U.S. at 263.  Furthermore, "only a 'firmly established and regularly followed state practice' may be

interposed by a State to prevent subsequent review . . . of a federal constitutional claim."  *Ford v.*

*Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984));

*see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir.

1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must

be clear, consistently applied, and well-established at the time of the petitioner's purported

default.").

Even were the Court to conclude that petitioner's claims are procedurally default, it is still

necessary to consider the claims on the merits.  Petitioner can still have his defaulted claims

reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court

decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Sufficiency of the Evidence (Claim I)*

Petitioner first contends that the prosecution failed to present sufficient evidence to establish his guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA

standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, it is necessary to examine the elements of second degree murder under Michigan law.

Under Michigan law, the common law crime of murder is defined as second degree murder,

and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. These include murder done with premeditation and deliberation or committed in the course of certain enumerated felonies. *See* MICH. COMP. LAWS § 750.316(1)(a), (b).

Under Michigan law, "[p]remeditation is measured in time; time to permit a reasonable person to subject the nature of his response to a second look." *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984). "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995). Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing. *See id.*; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Further, because first degree murder requires premeditation and deliberation rather than simply malice aforethought (as is required for second degree murder), the actor must have the specific intent to kill in order to be convicted of first degree murder. *See People v. Hart*, 437 Mich. 898, 898, 465 N.W.2d 328, 328 (1991); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984);

*People v. Aaron*, 409 Mich. 672, 715 n.102, 299 N.W.2d 304, 320 n.120 (1980). As with premeditation, "[t]he specific intent to kill may be proven by inference from any facts in evidence." *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (internal quotation omitted). Specifically, and in addition to other factors, the Court "may take into consideration 'the nature of the defendant's acts constituting the assault . . . [and] whether the instrument and means used were naturally adapted to produce death[].'" *Id.* (quoting *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 8 (1985)).

Petitioner was also convicted of assault with intent to commit murder. Michigan law provides that "[a]ny person who shall assault another with intent to commit the crime of murder, shall be guilty of a felony[.]" MICH. COMP. LAWS § 750.83. Under this provision, "the crime of assault with intent to commit murder requires proof of three elements: '(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder.'" *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (quoting *People v. Plummer*, 229 Mich. App. 293, 581 N.W.2d 753, 759 (1998); *People v. Hoffman*, 225 Mich. App. 103, 570 N.W.2d 146, 150 (1997)). Further, as with first degree murder, intent to kill need not be proved by direct evidence, but rather may be proved by circumstantial evidence and reasonable inferences drawn from the evidence. *See Warren*, 161 F.3d at 360; *Hoffman*, 225 Mich. App. at 111, 570 N.W.2d at 150.

Finally, under Michigan law voluntary intoxication is not an excuse for a crime, and therefore does not serve as a defense to a general intent crime. It may, however, negate the specific intent necessary to commit a crime requiring a showing of specific intent. *See People v. Langworthy*, 416 Mich. 630, 638, 331 N.W.2d 171, 173 (1982). To negate a specific intent on the basis of voluntary intoxication, it is not enough for a defendant to show that he was intoxicated, or

even that his intoxication affected his judgment. Rather, he must show that he was "intoxicated to the point at which he was incapable of forming the intent to commit the charged crime." *People v. Mills*, 450 Mich. 61, 82, 537 N.W.2d 909, 920 (1995); *People v. Savoie*, 419 Mich. 118, 133-34, 349 N.W.2d 139, 146 (1984); *People v. King*, 210 Mich. App. 424, 428, 534 N.W.2d 535, 536 (1995).

      2.    *Analysis*

Petitioner argues that the lack of any direct or circumstantial evidence of his actual intent, coupled with the significant evidence of his intoxication at the time of the shootings, renders the evidence at trial insufficient to sustain his conviction. The Michigan Court of Appeals rejected this argument. First, the court explained that there was circumstantial evidence of premeditation presented at trial:

> In the instant case, the circumstances surrounding the killing support a finding of premeditation. Evidence indicated that leading up to the shootings, defendant had wanted everybody to leave the house. The victims stayed, however, and defendant subsequently expressed anger at McMillian during an argument about money and trust. It was approximately one half hour after this argument that defendant shot Thompson in the stomach. He had an opportunity to reflect on his action before he shot McMillian. Moreover, defendant next walked up to McHolmes before purposely placing the gun in his stomach and shooting him.

*Woodard*, 2001 WL 1134886, at *2, slip op. at 3. Second, the court rejected petitioner's argument that there was insufficient evidence to rebut his intoxication defense. The court noted that the prosecutor's expert testified that petitioner was able to form the requisite intent, and it was for the jury to weigh the credibility of the experts. *See id*. at *3, slip op. at 3. The Court should conclude that this determination was reasonable.

As the court of appeals observed, despite some testimony from the victims that petitioner shot them for no reason, in at least one of his statements to the police petitioner indicated that he was mad at the victims because they would not leave his house. There was also testimony from the

victims that petitioner was mad at McMillian because McMillian owed him money. Petitioner contends that this evidence was not credible, but it is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996); *see also, United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). Further, although there was some evidence which supports petitioner's contention that the shootings were spur of the moment and done for no reason, the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326. The evidence that petitioner was mad at the victims, coupled with the time he had to reflect on his actions and the deliberateness of those actions, provides sufficient circumstantial evidence of petitioner's intent to support the jury's verdict.

Likewise, as the court of appeals observed, petitioner's intoxication defense came down to a credibility contest between the parties' experts. As with the fact witnesses, the jury was free to credit the testimony of the prosecutor's expert witness over that of petitioner's expert. *See United States v. Brown*, 360 F.3d 828, 832 (8th Cir. 2004); *Knapp v. Leonardo*, 46 F.3d 170, 179 (2d Cir. 1995). Further, there was additional circumstantial evidence that petitioner was not so intoxicated that he was unable to form the specific intent to kill the victims. For example, petitioner was able to recall some details of the shootings. *See Wiley v. Wainwright*, 793 F.2d 1190, 1194 (11th Cir. 1986); *McNair v. Campbell*, 307 F. Supp. 2d 1277, 1330-31 (M.D. Ala. 2004); *United States ex rel. Gill v. Gramley*, 16 F. Supp. 2d 924, 934 (N.D. Ill. 1998). Further, after the murder petitioner took steps to flee the scene and to conceal his crime by disposing of the gun. *See Reid v. True*, 349 F.3d

788, 800 (4th Cir. 2003); *Gill*, 16 F. Supp. 2d at 934. Thus, there was sufficient evidence that petitioner was capable of forming the intent necessary for first degree murder and assault with intent to commit murder convictions. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Courtroom Seating Arrangement (Claim III)*

Petitioner next contends that he was denied a fair trial by the seating arrangement in the courtroom. Specifically, petitioner contends that he was not permitted to sit next to defense counsel at the defense table, but was required to sit across from counsel. Petitioner contends that this seating arrangement put him "virtually in the center of the courtroom well area," Pet., at 41, and argues that to require him to sit in this "highly conspicuous" area was "inherently prejudicial." *Id.* The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

Although the Supreme Court has never addressed a defendant's seating in the courtroom, it has in a number of cases addressed whether a situation, arrangement, or presence in the courtroom during a criminal trial prejudiced a defendant by biasing the jury against him. "The criminal process presumes that a defendant is innocent until proved guilty." *United States v. Larson*, 460 F.3d 1200, 1214 (9th Cir. 2006), *vacated in part on reh'g en banc*, 495 F.3d 1094 (9th Cir. 2007) (citing *Deck v. Missouri*, 544 U.S. 622, 630 (2005); *Estelle v. Williams*, 425 U.S. 501, 503 (1976)).[2] For this reason, "the Constitution prohibits any courtroom arrangement or procedure that 'undermines the presumption of innocence and the related fairness of the factfinding process.'" *Larson*, 460 F.3d at

---

[2]The *en banc* Ninth Circuit vacated that portion of the *Larson* decision discussing a confrontation issue. The *en banc* decision explicitly adopted the remainder of the panel's decision, including the panel's discussion of the courtroom seating arrangement. *See Larson*, 495 F.3d at 1099 n.4.

1214 (quoting *Deck*, 544 U.S. at 630). The Supreme Court's cases "demontrate that [a court's] core concern in this area is to avoid any procedure that undermines the presumption of innocence by conveying a message to the jury that the defendant is guilty." *Larson*, 460 F.3d at 1215. The task for a reviewing court is determine whether "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (internal quotation omitted). The question is whether the courtroom arrangement was so inherently prejudicial that it branded the defendant with an "unmistakable mark of guilt." *See id.* at 571. An inherently prejudicial courtroom arrangement must be justified by an essential state interest; however, an arrangement which is not inherently prejudicial need not be justified by any state interest. *See Larson*, 460 F.3d at 1216. As the Court explained in *Flynn*:

> All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

*Flynn*, 475 U.S. at 572.

2. *Analysis*

Here, petitioner has failed to show that he was actually prejudiced by the courtroom seating arrangement or that the seating arrangement was so inherently prejudicial that he was branded with an "unmistakable mark of guilt" in the eyes of the jurors. Although petitioner characterizes the seating arrangement as leaving him in the middle of the courtroom, petitioner does not contend that he was separated from other participants or conspicuously placed apart from the proceedings in a special section reserved solely for defendants, such as a dock. Rather, petitioner by his own accounts was seated at the defense table, directly across from defense counsel. Petitioner presents

no plausible reason why his seating across from, rather than next to, defense counsel was inherently prejudicial. It is probable that the "jury may not have even thought it remarkable that [petitioner was] seated immediately [across from his] attorney[]. The jury most likely drew no impermissible inference from the arrangement." *Larson*, 460 F.3d at 1215 (internal quotation omitted) (citing *Flynn*, 475 U.S. at 569). Because petitioner was not segregated from other participants, and indeed was seated at counsel table, the Court can be "confident that the seating arrangement was simply 'taken for granted,'" and "in no way conveyed a message of [petitioner's] guilt[.]" *Larson*, 460 F.3d at 1215 (quoting *Flynn*, 475 U.S. at 569) (finding seating arrangement not inherently prejudicial where defendants were seated in row immediately behind counsel); *see also*, *United States v. Balsam*, 203 F.3d 72, 82 (1st Cir. 2000) (same). Further, petitioner does not allege that the seating arrangement interfered with his ability to communicate with his counsel or assist in his defense. *See United States v. Rodriguez-Duran*, 507 F.3d 749, 776 (1st Cir. 2007). For these reasons, the court of appeals's rejection of petitioner's claim was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G. *Prosecutorial Misconduct (Claim V)*

Petitioner next contends that he was denied a fair trial by the prosecutor's comments at trial. Specifically, petitioner claims that the prosecutor improperly: (1) used inference upon inference to convict him; (2) misstated the evidence regarding petitioner's motive and intent to kill; (3) mischaracterized the medical examiner's testimony; and (4) commented on petitioner's failure to testify. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1. *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough

that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2.  *Analysis*

a.  *Use of Inference*

Petitioner contends that the prosecutor misstated the law and used impermissible inference by arguing that the length of time alone was sufficient to establish premeditation and deliberation. The prosecutor did argue during rebuttal that "there is no set rule" on how long premeditation takes, *see* Trial Tr., Vol. III, at 135, but this was an accurate statement of the law. Contrary to petitioner's argument, the prosecutor did not rely solely on the lapse of time as evidence of petitioner's intent to kill. Rather, the prosecutor argued that the lapse of time coupled with petitioner's motive–his anger at the victims–established premeditation and deliberation. *See id.* at 134-35. Thus, the prosecutor's comments regarding the time petitioner had to deliberate were not improper, and

petitioner is not entitled to habeas relief on this claim.

### b. Misstatement Regarding Motive and Intent

Petitioner next contends that the prosecutor misstated the evidence regarding his motive and intent. At trial, Officer Croskey testified that when petitioner turned himself in, he indicated that he shot the victims because "he was mad at *them*." Trial Tr., Vol. II, at 60 (emphasis added). During rebuttal argument, however, the prosecutor focused solely on the deceased victim–McMillian–stating that petitioner told the officers that "he shot *him* because he was mad at *him*." *Id*., Vol. III, at 134 (emphasis added). Petitioner argues that changing the focus of the testimony from petitioner's anger at all the victims to only petitioner's anger at McMillian was prejudicial because it went to the central issue in the case, namely, petitioner's premeditated intent to kill. However, it is not clear how the prosecutor's statement affected the jury in any manner. The focus on McMillian occurred as a result of defense counsel's closing statement, which focused on the lack of any premeditation, the evidence that it was McMillian in particular who may have aroused petitioner's ire over a money dispute, and the fact that McMillian was the only victim who died. Further, the prosecutor's comment was not in any way a misstatement of the facts. If petitioner was angry at all of the victims, then he necessarily was angry at McMillian. Thus, the focus from "them" to "him" was not inaccurate, and occurred as a natural result of the fact that, by the time of the prosecutor's rebuttal, the case had become focused almost exclusively on whether petitioner premeditated the killing of McMillian. Thus, petitioner was not denied a fair trial by this comment, and the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Mischaracterization of Medical Examiner's Testimony

Petitioner next argues that the prosecutor mischaracterized the medical examiner's testimony.

At trial, the medical examiner testified that the bullet which killed McMillian entered and exited the left arm, and reentered the body in the left armpit area, traversing the chest from left to right, exiting slightly lower on the right side of the chest. *See* Trial Tr., Vol. II, at 49-50. During closing argument, the prosecutor stated: "Latonya Thompson was struck in the abdomen. She is lucky to be here to talk to you about it. She is hit in the torso. He is high or is it some sort of accident? Well, what does he do now? He chooses to turn and kill – he kills Johnny McMillian. He puts a bullet within an inch of his heart and kills him." *Id.*, Vol. III, at 117-18. Petitioner contends that the prosecutor's argument insinuated that he had fired directly at McMillian's heart, contrary to the medical examiner's testimony, and that this mischaracterization went to the crux of the premeditation issue. Again, however, the prosecutor's comment was not inaccurate; it corresponded to the medical examiner's testimony regarding the trajectory of the bullet. It is true that the medical examiner did not testify that petitioner aimed directly at McMillian's heart, but neither did the prosecutor so state. Rather, the crux of the prosecutor's argument was that premeditation was shown by the fact that petitioner turned and shot McMillian after shooting Thompson, not that he aimed directly at his heart. And, in any event, counsel had the opportunity to correct any misimpression the prosecutor's alleged mischaracterization may have caused. In short, the prosecutor's characterization of the medical examiner's testimony was, even if incomplete, accurate, and petitioner cannot show that he was denied a fair trial by this comment. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Comment on Petitioner's Failure to Testify

Finally, petitioner contends that the prosecutor impermissibly commented on his failure to testify and his invocation of his right to remain silent. During rebuttal argument, responding to

defense counsel's argument, the prosecutor stated:

> Counsel said, well, if you believe the prosecutor's case, there is no premeditation and deliberation. And he keeps wanting to talk about motive. Well, I wish the defendant had been honest with the folks that he talked to after he turned himself in at the precinct, because I'd like to know that. And I assume you would too.
>
> He told the officers at the desk at the Thirteenth Precinct, I shot him because I was mad at him. I wish I knew about what, but I don't know. And if you don't know, you can conclude that he wanted him out of the house or it was about this dispute over drugs or his girlfriend doing drugs, or any number of things. But, all of the sudden, out of his mouth, he tells you why. And then on the way down to homicide he figures it out. He can't say that. He will have no defense. And the story grows from there."

Trial Tr., Vol. III, at 134. Petitioner contends that this argument suggested to the jury that petitioner was concealing something from them by not telling the police why he shot the victims and by not testifying, and that the jury should draw an adverse inference from petitioner's failure to testify. The Court should disagree.

First, the prosecutor's argument did not improperly comment on petitioner's failure to testify. In order to conclude that the prosecutor's remarks amounted to an impermissible comment on petitioner's failure to testify, the Court "must find one of two things: that the prosecutor's manifest intention was to comment upon the accused's failure to testify or that the remark was of such a character that the jury would naturally and necessarily take it to be a comment of the failure of the accused to testify." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981) (internal quotations omitted); *accord Byrd v. Collins*, 209 F.3d 486, 533-34 (6th Cir. 2000); *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988). Here, the prosecutor did not mention petitioner's failure to testify, or in any other way allude to the need for petitioner to present evidence regarding his motive. On the contrary, the crux of the prosecutor's argument was that while it would have been better to know the reason for petitioner's anger at the victims, it was ultimately irrelevant because the fact

of the anger alone showed the motive. Thus, the prosecutor's comment was not manifestly intended to comment on petitioner's failure to testify, nor would it necessarily have been taken as such a comment by the jury.

Nor did the prosecutor's argument impermissibly comment on petitioner's invocation of his right to remain silent. The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Nevertheless, *Doyle* does not apply where the accused actually speaks with the police. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408 (1980).[3]

---

[3]In *Anderson*, the Court considered explicitly the situation where a prior statement is used to impeach the defendant's subsequent trial testimony, a situation not present in petitioner's case. Nevertheless, the Sixth Circuit has held that *Anderson* is not limited to this specific context:

> The defendant contends that *Anderson v. Charles* does not control this case because he never made a prior statement which was inconsistent with his trial testimony. This argument relies on a reading of *Anderson v. Charles* which is too restrictive. While there was a prior inconsistent statement in that case, it merely furnished the occasion for questioning the defendant. There is no indication that the Court limited its holding to situations involving prior inconsistent statements. What *Anderson v. Charles* teaches is that the *Doyle* rule has no application unless the defendant has remained silent and

Here, the prosecutor did not comment on petitioner's *Miranda*-induced silence. Rather, the prosecutor's comments went to what petitioner voluntarily told the police, and the gaps in the version of events related by petitioner to the police. Thus, the prosecutor's argument did not impermissibly comment on defendant's invocation of his right to remain silent. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H. *Ineffective Assistance of Counsel (Claims II, IV, VI and VII)*

Petitioner next raises several claims that his trial and appellate attorneys were ineffective. Specifically, petitioner contends that trial counsel was ineffective for: (1) failing to move to suppress his statements to the police; (2) asking the prosecutor's expert whether petitioner could have premeditated the killing; (3) failing to object to the courtroom seating arrangement; and (4) failing to object to prosecutorial misconduct. Petitioner also contends that his appellate attorney was ineffective for failing to raise his fourth through sixth habeas claims on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1. *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here

---

could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings.
*United States v. Crowder*, 719 F.2d 166, 172 (6th Cir. 1983).

is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

### 2. *Trial Counsel (Claims II, IV, and VI)*

#### a. *Failure to Seek Suppression of Statement (Claim II)*

Petitioner first contends that trial counsel was ineffective for failing to move to suppress his statements to the police. He contends that these statements were taken in violation of his right to remain silent, and thus would have been suppressed had counsel so moved. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

To be entitled to habeas relief on this claim, petitioner must establish both "that had the motion been filed, there was a reasonable probability that the evidence would have been suppressed,

and the outcome of the trial would have been different had the evidence been suppressed." *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994). Here, petitioner cannot show that had counsel moved to suppress his statements to the police, the motion would have been granted.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the applicability of the Fifth Amendment's Self-Incrimination Clause to custodial interrogations by the police. The Court ruled that, in some circumstances, statements made while in custody can violate the Self-Incrimination Clause even if the statement was otherwise "voluntary" under the Due Process Clause. As the Court has more recently explained, the *Miranda* decision

> concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." [*Miranda*, 384 U.S.] at 439. Accordingly, we laid down "concrete guidelines for law enforcement agencies and courts to follow." *Id.*, at 442. Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of any attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.*, at 479.

*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (parallel citations omitted). The *Miranda* Court explained that if the suspect indicates that he wishes to remain silent, "the interrogation must cease." *Miranda*, 384 U.S. at 474. Similarly, if the suspect requests counsel "the interrogation must cease until an attorney is present." *Id.*; *see also*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Although it has been characterized otherwise at times, the rule of *Miranda* is of federal constitutional dimension. *See Dickerson*, 530 U.S. at 438-40. Thus, claims based on the right to counsel at questioning recognized in *Miranda* are cognizable on habeas review. *See id.* at 439 n.3;

*Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

The *Miranda* rule protects a suspect's Fifth Amendment privilege not to be "compelled" to incriminate himself. The rule is based on the notion that "custodial police interrogation, by its very nature, isolates and pressures the individual," and therefore "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Dickerson*, 530 U.S. at 435 (quoting *Miranda*, 384 U.S. at 439). To guard against this, *Miranda* "laid down 'concrete guidelines for law enforcement agencies and courts to follow.'" *Id.* (quoting *Miranda*, 384 U.S. at 442). This rationale for the rule, however, also limits its applicability to only those interrogations which are "custodial." *See Thompson*, 516 U.S. at 102; *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (per curiam); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) (per curiam). "Custody for *Miranda* purposes has been . . . narrowly circumscribed." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). As the Court explained in *Miranda*, an interrogation is custodial only where the suspect "has been taken into custody or otherwise deprived of is freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In other words, although a court must consider the totality of the circumstances surrounding the interrogation, the ultimate inquiry is whether there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Murphy*, 465 U.S. at 430 (internal quotation omitted); *see also*, *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam).

Here, there is nothing in the record to support petitioner's claim that he was in custody at the time he made his statements to the police. Petitioner entered the police station of his own accord, and announced voluntarily and without prompting that he had shot three people. While the officers

on duty did question petitioner regarding his claim, there is nothing that indicates that petitioner was in custody at the time of this questioning. Petitioner asserts only that the police obviously would not have let him leave, because he had just confessed to shooting three people. However, as the Supreme Court has explained, "the initial determination of custody depends upon the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. Thus, petitioner's subjective belief that he was not free to leave does not affect the analysis. Rather, "the only relevant inquiry is how a reasonable man in [petitioner]'s position would have understood his situation." *Berkener v. McCarty*, 468 U.S. 420, 442 (1984); *see also*, *Thompson*, 516 U.S. at 112; *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). There is no objective indication that petitioner's freedom of action had been restrained in any manner. For example, petitioner does not allege that he was handcuffed, formally placed under arrest, or even separated from the general public at the time the officers questioned him regarding his confession. Petitioner was not taken to the police station against his will, nor even requested to come by the police; rather, he came voluntarily to report his crime. In these circumstances, petitioner was not in custody at the time he made his statements to the police. *See Yount v. Patton*, 710 F.2d 956, 961-62 (3d Cir. 1983), *rev'd on other grounds*, 467 U.S. 1025 (1984); *Sullivan v. Alabama*, 666 F.2d 478, 482 (11th Cir. 1982); *cf. United States v. Wyatt*, 179 F.3d 532, 536-37 (7th Cir. 1999). *See generally*, *Miranda*, 384 U.S. at 478 ("There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime."). The fact that the officers questioned petitioner at that time is irrelevant, as petitioner was not in custody under *Miranda*. *See Sullivan*, 666 F.2d at 482 (*Miranda* does not prohibit a police officer from making an "initial inquiry" into matters encountered in the course of

his employment in an "attempt to investigate and probe those situations.").

Thus, petitioner cannot show a reasonable probability that any motion to suppress his statement by counsel would have been successful, and he therefore cannot show that counsel was ineffective for failing to file such a motion. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Questioning of Prosecution Expert (Claim II)

Petitioner next contends that counsel was ineffective in his questioning of the prosecution's expert. During recross examination, counsel asked the prosecution's expert:

> Q:  Did Mr. Woodard have the chance to premeditate the murder? In other words, think it out beforehand based on his particular state of mind at the time of the offense based on what you know?
>
> A:  From all the information I received, if he had chosen to make that intent, he could have.

Trial Tr., Vol. III, at 112. The Michigan Court of Appeals rejected petitioner's claim, concluding that he was not prejudiced by counsel's question:

> Montgomery's response to defense counsel's question did not prejudice defendant. Montgomery had already testified that defendant did not suffer from diminished capacity and it would have been reasonable for the jury to infer that this meant that defendant could have premeditated the killing. Accordingly, Montgomery's response merely reaffirmed what she had opined on direct examination. Defendant has not demonstrated a reasonable probability that he would have been acquitted of first-degree murder, but for counsel asking this one question.

*Woodard*, 2001 WL 1134886, at *4, slip op. at 4. The Court should conclude that this determination was reasonable.

Although counsel did not elicit the response from Montgomery that he might have hoped for, the question itself was not improper. At that point, Montgomery had testified extensively that petitioner was not suffering from diminished capacity or any form of psychosis that in general would

have prevented petitioner from forming the specific intent to kill. Counsel sought to elicit from the witness whether in light of all the circumstances–including petitioner's intoxication and the abrupt nature of the shootings–petitioner could have premeditated the killing, in an attempt to reinforce for the jury that this was a senseless, unplanned crime. And contrary to petitioner's argument, Montgomery did not state that petitioner had in fact formed the specific intent to kill. She stated only that petitioner could have done so. This, however, was precisely what she had already testified to on direct examination. Thus, the court of appeals's conclusion that petitioner was not prejudiced by this question was reasonable, and petitioner accordingly is not entitled to habeas relief on this claim.

 *c. Failure to Object to Seating Arrangement and Prosecutorial Misconduct (Claims IV and VI)*

Finally, petitioner contends that counsel was ineffective for failing to object to the courtroom seating arrangement and to the alleged instances of prosecutorial misconduct. However, as explained above, petitioner cannot show that he was prejudiced by either the seating arrangement or any comments of the prosecutor. He therefore cannot show that he was prejudiced by counsel's failure to object. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these claims.

3. *Appellate Counsel (Claim VII)*

Finally, petitioner contends that his appellate counsel was ineffective for failing to raise his fourth through sixth habeas claims on direct appeal. In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained in this Report, all of petitioner's claims are without merit, and thus petitioner

cannot show that counsel was ineffective for failing to raise them on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.     *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 12/23/08

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on December 23, 2008.

s/Eddrey Butts
Case Manager